**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| PRECISION FRANCHISING LLC,     ) | |
|                       ) | |
|     Plaintiff,              ) | |
|                       ) | |
|         v.               ) | Civil Action No. 1:18-cv-582 (LMB/TCB) |
|                       ) | |
| DISTRICT HEIGHTS CCS LLC, et al.,     ) | |
|                       ) | |
|     Defendants.            ) | |
|                       ) | |

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on Plaintiff's Motion for Default Judgment (Dkt. 8). After representatives for Defendants failed to respond to Plaintiff's motion or to appear at the hearing on August 10, 2018, the matter was taken under advisement.[1] For the reasons stated below, the undersigned U.S. Magistrate Judge recommends that Plaintiff's Motion for Default Judgment be GRANTED.

## I. INTRODUCTION

### A. Background

On May 16, 2018, Precision Franchising LLC ("Plaintiff") filed this lawsuit against District Heights CCS LLC ("DHCCS") and Sean Alewine ("Mr. Alewine") (together "Defendants"), alleging that Defendants breached the Precision Tune Auto Care Franchise Agreement (the "Franchise Agreement") that they entered into with Plaintiff. Plaintiff now seeks

---

1. Relevant filings before the Court include Plaintiff's Complaint (Dkt. 1) ("Compl."), the Precision Tune Auto Care Franchise Agreement (Dkts. 1-1 & 8-1) ("Fran. Agr."), Plaintiff's Motion for Default Judgment (Dkt. 8) ("Pl.'s Mot. Default J."), the Declaration of Robert Falconi in Support of Plaintiff's Motion for Default Judgment (Dkt. 8-5) ("Falconi Decl."), and all attachments and exhibits submitted with those filings.

an entry of default judgment that awards it monetary damages and attorney's fees and costs. (Pl.'s Mot. Default J. at 1, 7-10.)

## B. Jurisdiction and Venue

Before the Court can render default judgment, it must have both subject-matter jurisdiction and personal jurisdiction over the defaulting parties, and venue must be proper.

The Court has subject-matter jurisdiction over this action. A court shall have subject-matter jurisdiction when an action involves a dispute between citizens of different states and the amount in controversy exceeds the sum of $75,000.00. See 28 U.S.C. § 1332(a). In this case, Plaintiff is Virginia limited liability company with its principal place of business in Leesburg, Virginia, and therefore a citizen of Virginia. (Compl. ¶ 3.) Defendant DHCCS is a Maryland limited liability company with an apparently principal place of business in Maryland and is therefore a citizen of Maryland. (Id. ¶ 4.) Defendant Mr. Alewine is a natural person who is a resident of Maryland and is therefore a citizen of Maryland. (Id.) With regards to the amount in controversy, the amount sought by Plaintiff exceeds $75,000.00. (Id. ¶¶ 4, 33, 36.) Accordingly, with Plaintiff and Defendants being citizens of different states and Plaintiff seeking more than $75,000.00, the Court has subject-matter jurisdiction over this action.

The Court has personal jurisdiction over Defendants in this action. For personal jurisdiction over a defendant, the standards of both federal due process and the forum state's long-arm statute and must be satisfied. See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012). Federal due process permits personal jurisdiction where a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S.

2

457, 463 (1940)). Virginia's long-arm statute, Virginia Code § 8.01-328.1, "extends the jurisdiction of its courts as far as federal due process permits." ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 176 (4th Cir. 2002). With federal due process and Virginia's long-arm statute requiring the same standards, essentially only one personal jurisdiction inquiry is required. See id. The inquiry to find personal jurisdiction requires either specific jurisdiction "based on conduct connected to the suit" or general jurisdiction based on "continuous and systematic" activities in the forum state. Tire Eng'g & Distrib., 682 F.3d at 301 (quoting ALS Scan, Inc. v. Dig. Serv. Consultants, Inc., 293 F.3d 707, 711 (4th Cir. 2002)). A reasonable forum-selection clause in a contract is sufficient for a court to have personal jurisdiction over the parties to the contract that agreed to litigate claims in such a selected forum. See Albemarle Corp. v. AstraZeneca UK Ltd., 628 F.3d 643, 649-50 (4th. Cir. 2010). Defendants have caused injury in Virginia to Plaintiff, a Virginia resident, as a result of their acts and omissions related to their duties under the Franchise Agreement. (Compl. ¶ 6.) Further, Defendants have agreed to litigate claims related to the Franchise Agreement in this Court, pursuant to a forum-selection clause in the Franchise Agreement. (Id.) Therefore, Defendants maintained sufficient contacts with Virginia based on conduct connected to this case for personal jurisdiction to be proper in Virginia courts, and so the Court has personal jurisdiction over Defendants under the specific jurisdiction inquiry.

Venue in this action is proper in this Court. Venue in a court is proper when the action is brought in a judicial district in which a substantial part of the events or omissions giving rise to the action occurred. See 28 U.S.C. § 1391(b). In this case, venue in this Court is proper because a substantial part of the events giving rise to the claims in this case, specifically, Defendants' acts and omissions related to the Franchise Agreement, resulted in harm to Plaintiff in this Court's judicial district. (Compl. ¶ 7.) Further, with regards to venue, a reasonable forum-selection clause

3

agreed to by parties is sufficient to set venue in a specific court's judicial district. See Albemarle Corp., 628 F.3d at 649-50. Therefore, venue is further proper in accordance with the reasonable forum-selection clause in the Franchise Agreement that Defendants had agreed to. (Compl. ¶ 7.)

C. Service of Process

Before the Court can render default judgment, it must be satisfied that all defaulting parties have been properly served. As a general rule, a defendant must be served with the summons and complaint filed with a federal court. See FED. R. CIV. P. 4. However, various avenues exist to serve a defendant.

In serving process to an individual, a plaintiff may effectuate service by delivering a copy of the summons and copy of the complaint to the individual personally. See FED. R. CIV. P. 4(e)(2)(A). In serving process to a business entity such as a limited liability corporation, a plaintiff may effectuate service by delivering a copy of the summons and a copy of the complaint to an officer or managing agent of the business entity. See FED. R. CIV. P. 4 (h)(1)(B). Here, Plaintiff had a private process server provide a copy of the summons and a copy of the complaint in this case to Mr. Alewine, who is the sole member and owner of DHCCS, which is a limited liability corporation. (Dkt. 4.) Therefore, service of process on both Defendants was proper in accordance with the Federal Rules of Civil Procedure.

D. Grounds for Default Judgment

The entry of default judgment may be appropriate when a defendant has failed to appear in a case. See FED. R. CIV. P. 55. To date, Defendants have not appropriately appeared or otherwise participated in these proceedings. On June 21, 2018, Plaintiff filed its Motion for Entry of Default (Dkt. 6), seeking entries of default for Defendants. On June 25, 2018, the Clerk of the Court issued the Entry of Default (Dkt. 15) for Defendants. On July 17, 2018, Plaintiff filed its

4

Motion for Default Judgment. The Court then held a hearing on Plaintiff's Motion for Default Judgment on August 9, 2018, at which no representative for Defendants appeared. Finding the matter uncontested, the Court took the matter under advisement for the undersigned to issue this Report and Recommendation.

## II. FINDINGS OF FACT

Upon a full review of the pleadings and the record in this case, the undersigned finds that Plaintiff has established the following facts.

Plaintiff is a Virginia limited liability company with its principal place of business in Leesburg, Virginia. (Compl. ¶ 3.) Plaintiff is wholly owned by Precision Tune Auto Care, Inc., a Virginia corporation with it principal place of business also in Leesburg, Virginia. (Id.) Plaintiff is the franchisor of the Precision Tune Auto Care system and is engaged in the business of franchising independent business persons to operate automotive service centers that are identified with the Precision Tune Auto Care service mark and related marks and logos. (Id. ¶ 8.) The Precision Auto Care system involves the retail sale of automotive products and services and utilizes unique and specialized business practices. (Id.) Franchisees operating under the Precision Tune Auto Care system receive a license to use the trademarks, service marks, trade names, logos, and trade dress of Precision Tune Auto Care in exchange for the payment of royalty fees and advertising fees. (Id.)

Defendant DHCCS is a Maryland limited liability corporation. (Id. ¶ 4.) Defendant Mr. Alewine is a natural person who is a resident of Maryland and is the sole member and owner of DHCSS. (Id.) On December 9, 2013, DHCCS entered into a Franchise Agreement with Plaintiff to operate a Precision Tune Auto Care center (the "Center") in District Heights, Maryland. (Id. ¶ 9; Fran. Agr. at 30.) Also on December 9, 2013, DHCCS entered into a First Addendum to

5

Franchise Agreement with Plaintiff, which altered the operating fee payment schedule. (Compl. ¶ 10, Ex. B.) Also on December 9, 2013, Mr. Alewine executed a Guaranty Agreement, personally guaranteeing DHCCS's obligations under the Franchise Agreement. (Id. ¶¶ 11, 22, Ex. C.)

In accordance with the Franchise Agreement, DHCCS generally assumed the rights and obligations to operate its business utilizing the Precision Tune Auto Care trade name, trademarks, trade dress, proprietary marks, and the Precision Tune Auto Care system. (Compl. ¶ 12.) The Franchise Agreement also specifically outlined agreements between Plaintiff and DHCCS related to advertising fees, sale of the franchised business, and termination of the Franchise Agreement. (Compl. ¶¶ 13-21.) The Franchise Agreement refers to Plaintiff as "Franchisor," DHCCS as "Franchisee," the franchised Precision Auto Tune Care business as "Center" or "Franchised Business," the unique Precision Auto Tune Care marks as "Marks," and the Franchise Agreement itself as the "Agreement." (Fran. Agr. at 1.)

With regards to advertising fees, as part of the Franchise Agreement, DHCCS agreed that it would pay Plaintiff or Plaintiff's designee advertising fees equal to 9% of the Center's weekly gross sales, but not less than $360.00 per week. (Id. ¶ 13; Fran. Agr. ¶ 13.1.) DHCCS further agreed through the Franchise Agreement that if Plaintiff or its designee established certain advertising funds or cooperatives, that DHCCS would contribute to each fund amounts that Plaintiff would designate, which would not exceed 9% of gross sales, and DHCCS recognized that such advertising funds were intended to benefit all Precision Tune Auto Care franchisees. (Compl. ¶¶ 16-17; Fran. Agr. ¶¶ 13.2, 13.2.1-.3, 13.3.1.) At the time of the Franchise Agreement, such national funds required DHCCS to contribute 1.5% of gross sales. (Fran. Agr. ¶ 13.2.1.) DHCCS also agreed through the Franchise Agreement that if at any time its total required contribution to such funds was less than 9% of gross sales, it would allocate the remaining

6

amount for local advertising and promotion, and that DHCCS would spend all amounts allocated for local advertising and promotion within twelve weeks after the amounts being allocated. (Compl. ¶ 16; Fran. Agr. ¶ 13.2.4.)

With regards to sale of the franchised business, DHCCS agreed through the Franchise Agreement that Plaintiff's express prior written consent would be a necessary condition precedent to the sale, transfer, or conveyance of all or substantially all of the assets of the franchised business. (Compl. ¶ 18; Fran. Agr. ¶ 16.1.) DHCCS further agreed through the Franchise Agreement that if it received and wanted to accepted an offer from a third party to purchase all or part of DHCCS's interest in the franchised business, DHCCS would provide Plaintiff a written notice of any offer within five days, give Plaintiff thirty days to make a decision whether or not to exercise its right of first refusal, and provide Plaintiff all information and documentation that Plaintiff would request for its consideration. (Compl. ¶ 19; Fran. Agr. ¶ 16.4.)

With regards to termination of the Franchise Agreement, the term of the Franchise Agreement was to expire at December 9, 2023. (Compl. ¶ 13; Fran. Agr. ¶ 3.1.) The Franchise Agreement provided that DHCCS could not terminate its obligations under the Franchise Agreement prior to the expiration of the term, stating:

> Franchisee may not terminate this Agreement prior to the expiration of its term except (1) through legal process resulting from Franchisor's material, uncured breach of this Agreement or (2) with Franchisor's written consent.

(Compl. ¶ 14; Fran. Agr. ¶ 15.4.) The Franchise Agreement provided that DHCCS would be considered in default and that Plaintiff could terminate the Franchise Agreement if DHCCS ceased to operate or otherwise abandoned the Center, or DHCCS otherwise lost the right to possession of the Center, without Plaintiff's prior written consent, stating:

Franchisee shall be deemed to be in default, and Franchisor at its option may terminate this Agreement and all rights granted Franchisee hereunder, effective immediately upon notice to Franchisee and without affording Franchisee any opportunity to cure the default, upon the occurrence of ...

> ...
> Franchisee, without Franchisor's prior written consent, ceases to operate or otherwise abandons the Franchised Business, ceases to operate the Franchised Business under marks other than the Proprietary Marks, loses the right to possession of the Center premises, or forfeits the legal right to do or transact business in the jurisdiction where the Franchised Business is located[.]

(Compl. ¶ 15; Fran. Agr. ¶¶ 15.1, 15.1.2.)

With regards to expiration or termination of the Franchise Agreement, DHCCS agreed to pay all sums owed to Plaintiff. (Compl. ¶ 20; Fran. Agr. ¶ 17.1.5.) If the Franchise Agreement was terminated, DHCCS agreed to pay sums including an amount of future lost profits equal to the number of weeks remaining through DHCCS's then-current term multiplied by the greater of $300.00 or 7.5 percent of gross sales per week, to be discounted by 20 percent. (Compl. ¶ 20; Fran. Agr. ¶ 17.1.5.) DHCCS also agreed, in the event of any default by DHCCS, to pay costs and expenses of Plaintiff's reasonable legal and account fees incurred by Plaintiff in connection with obtaining relief against DHCCS. (Compl. ¶ 21; Fran. Agr. ¶ 17.2.)

Throughout Defendants' operation of the Center, Defendants failed to make some of the required marketing expenditures during the term of the Franchise Agreement. (Compl. ¶ 30.) In or around May 2018, Defendants notified Plaintiff that they wanted to sell their Center, and Plaintiff expressed an interest in purchasing it, but Defendants said that the sale must close quickly or else the Center would be sold to a third party that would not continue to operate the Center as a Precision Tune Auto Care center. (Id. ¶ 23.) On May 9, 2018, Plaintiff sent Defendants a Notice of Anticipatory Repudiation and a Notice of Audit, and Plaintiff reminded Defendants of their agreement to obtain Plaintiff's prior written approval and allow Plaintiff to

have a right of first refusal before selling the Center. (Id. ¶ 24, Ex. D.) On or around May 11, 2018, a representative for Defendants informed Plaintiff that Defendants had ceased operation of the Center and sold the assets and real property to a competing auto repair business. (Id. ¶ 25.) At no point did Defendants obtain Plaintiff's written consent to cease operation of the Center or afford Plaintiff its right of first refusal. (Id. ¶¶ 26-27.) Due to their sale of the Center, Defendants cannot exercise any future control over the Center in order to honor their obligations under the remaining term of the Franchise Agreement. (Id. ¶ 28.) On May 16, 2018, Plaintiff sent Defendants a Notice of Default and Termination, thereby terminating the Franchise Agreement immediately. (Id. ¶ 29, Ex. E.) As a result of Defendants failing to meet the requirements of the Franchise Agreement, Plaintiff has suffered injury and has incurred monetary damages, such as lost profits. (Id. ¶¶ 33, 36.)

## III. EVALUATION OF PLAINTIFF'S COMPLAINT

When a defendant has defaulted, the well-pleaded allegations of facts set forth in the plaintiff's complaint are deemed admitted. JTH Tax, Inc. v. Grabert, 8 F. Supp. 3d 731, 736 (E.D. Va. 2014) (citing Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001)). Before entering default judgment, however, the Court must evaluate the plaintiff's complaint against the standards of Federal Rule of Civil Procedure 12(b)(6) to ensure that the complaint properly states a claim. GlobalSantaFe Corp. v. Globalsantafe.com, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003). As such, it is appropriate to evaluate Plaintiff's complaint against the standards of Federal Rule of Civil Procedure 12(b)(6). In its complaint, Plaintiff brought two counts against Defendants related to the breach of the Franchise Agreement. (Compl. ¶¶ 31-36.) To address the alleged breach of contract, first the Court must apply the applicable state law, and then the Court must evaluate the facts in accordance with such law.

It appears that Virginia law is the most appropriate state law to apply to this case. When a federal court has diversity jurisdiction over an action such as this, it must apply the choice-of-law rules of the forum state. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under Virginia choice-of-law rules, generally, "the nature, validity, and interpretation of a contract is governed by the law of the place where made ... [a]nd, in Virginia, a contract is made at the place where the final act is done which necessary to make the contract binding." Hunter Innovations Co. v. Travelers Indem. Co. of Conn., 753 F. Supp. 2d 597, 602-03 (E.D. Va. 2010) (quotation marks and citations omitted). However, in an exception to its general rule, Virginia law states that where "a contract is made in one jurisdiction but performed in another, the law of the place of performance governs the contract." Id. at 603. It is unclear where the Franchise Agreement, as the contract at issue, was entered into, and it is also unclear where all aspects of the Franchise Agreement, such as the Center's business operations and related advertising, were performed. Therefore, because Plaintiff has not provided enough information upon which to conduct a formal choice-of-law analysis, Virginia law, as the law of the forum state, will be utilized to address this breach of contract action.

Plaintiff has sufficiently established that Defendants have breached the Franchise Agreement. Under Virginia law, the elements of a breach of contract action are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Squire v. Va. Hous. Dev. Auth., 758 S.E.2d 55, 60 (Va. 2014) (quoting Filak v. George, 594 S.E.2d 610, 614 (Va. 2004)). Plaintiff has established each of these elements as required under Virginia law. First, Plaintiff has established that Defendants owes Plaintiff legally enforceable obligations. Plaintiff and DHCCS entered into the Franchise Agreement, and Mr. Alewine entered into the

Guaranty Agreement, which required Defendants to abide by the terms of the Franchise Agreement when operating the Center as part of the Precision Tune Auto Care franchise. (Compl. ¶¶ 9-11, 22.) Second, Plaintiff has established that Defendants materially breached their obligations. A material breach is defined as "a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." Horton v. Horton, 487 S.E.2d 200, 204 (Va. 1997). Here, Defendants failed to sell their Center in accordance with the Franchise Agreement, and Defendants failed to make advertising expenditures as required by the Franchise Agreement. (Compl. ¶¶ 23-30.) Such failures constitute material breaches of the Franchise Agreement. Third, Plaintiff has established that Defendants' breaches caused Plaintiff to suffer damages. Defendants' failures to sell their Center in accordance with the Franchise Agreement and make advertising expenditures as required by the Franchise Agreement has resulted in monetary damages for Plaintiff, including lost profits. (Id. ¶¶ 33, 36.) Accordingly, default judgments against Defendants for breach of contract are appropriate.

## IV. REQUESTED RELIEF

Plaintiff seeks payment from Defendants in the amount of $318,325.33 in monetary damages,[2] comprised of $181,469.82 in damages in future lost profits pursuant to the Franchise Agreement and $136,855.52 in damages for Defendants' failure to make required advertising expenditures. (Compl. at 8-9; Pl.'s Mot. Default J. at 8-9.)[3] In assessing damages, "a district

---

2. Technically, adding the requested damages in future lost profits with the requested damages for Defendants' failure to make required advertising expenditures totals $318,325.34, which is $0.01 more than the total amount of damages requested by Plaintiff. However, because Plaintiff has requested to recover less than the total of its two amounts of requested damages, the Court accepts that Plaintiff is waiving recovery of the additional $0.01 that it otherwise could be entitled to.

3. Plaintiff also initially sought its reasonable attorney's fees and costs related to its legal action

court entering a default judgment may award damages ascertainable from the pleadings." Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians, 155 F.3d 500, 507 (4th Cir. 1998). Therefore, the Court considers each type of Plaintiff's requested damages in turn.

With regards to the damages in future lost profits, the Franchise Agreement itself states that in the event of termination of the Franchise Agreement future lost profits due to Plaintiff are calculated to be equal to the number of weeks remaining through the Franchise Agreement's term multiplied by the greater of $300.00 or 7.5 percent of gross sales per week, then discounted by 20 percent. (Fran. Agr. ¶ 17.1.5.) The future lost profits provision in the Franchise Agreement functions as a liquidated damages clause. Under Virginia law, liquidated damages clauses are enforceable by courts, unless "the damage resulting from a breach of contract is susceptible of definite measure" or "the stipulated amount would be grossly in excess of actual damages." O'Brian v. Langley Sch., 507 S.E.2d 363, 365 (Va. 1998) (quoting Brooks v. Bankson, 445 S.E.2d 473, 479 (Va. 1994)). The Franchise Agreement's future lost profits provision does not appear to address damages that are susceptible of definite measure or grossly in excess of actual damages. Accordingly, it is appropriate for the Court to enforce the Franchise Agreement's future lost profits provision as liquidated damages.

Plaintiff has provided a detailed declaration addressing the calculation of future lost profits pursuant to the Franchise Agreement. Specifically, Plaintiff declares that Defendants' weekly average of gross sales was $10,357.80. (Falconi Decl. ¶ 5.) When applied to the Franchise Agreement's future lost profit provision, Plaintiff calculates that the 292 weeks remaining in the term of the Franchise Agreement, multiplied by $776.84 as 7.5 percent of Defendants' gross sales per week, discounted by 20 percent, equates to $181,469.82 in future lost

enforcing the termination of the Franchise Agreement. (Pl.'s Mot. Default J. at 9-10.) However, Plaintiff has since informed the Court that it no longer seeks attorney's fees and costs. (Dkt. 15.)

profits that are owed to Plaintiff. (Id. ¶ 7.) Upon review, the Court finds such calculation to be correct, and therefore, Plaintiff is entitled to $181,469.82 in payment from Defendants.

With regards to Defendants' failure to make required advertising expenditures, the Franchise Agreement stated that Defendants were required to spend 9% of weekly gross sales on certain local advertising expenditures. (Fran. Agr. ¶ 13.2.4.) However, the Franchise Agreement also stated that if Plaintiff or its designee established certain national advertising funds or cooperatives, that DHCCS would contribute to each fund amounts that Plaintiff would designate, which would not exceed the 9% of gross sales, and that at the time of the Franchise Agreement, such national funds required Defendants to provide 1.5% of gross sales. (Id. ¶¶ 13.2, 13.2.1-.3, 13.3.1.) Therefore, Defendants were required to spend 7.5% of weekly gross sales on local advertising expenditures. However, Defendants did not spend all amounts as required. (Compl. ¶ 30.) Under Virginia law, it has long been held that "damages for the breach of a contract must be the logical and natural result of the breach, and must be established with reasonable certainty." Wood v. Pender-Doxey Grocery Co., 144 S.E.2d 635, 637 (Va. 1928). Damages resulting from Defendants' failure to meet its obligations for local advertising expenditures under the Franchise Agreement are therefore appropriate to award to Plaintiff as the logical and natural result of Defendants' breach.

Plaintiff has provided a declaration addressing the calculation of damages pursuant to Defendants' failure to meet their obligations under the Franchise Agreement for local advertising expenditures. Specifically, Plaintiffs declare that Defendants spent only 2.5% of weekly gross sales on such local advertising expenditures instead of the required 7.5%. (Falconi Decl. ¶ 8.) Plaintiff declares that Defendants' gross sales were $2,737,110.41, and so Defendants were required to spend 7.5% of that amount, or $205,283.28, on local advertising expenditures. (Id. ¶

9.) However, Plaintiff declares that Defendants spent only 2.5% of that amount, or $68,427.76, meaning that Plaintiff is owed $136,855.52 worth in local advertising expenditures. (Id.) Upon review, the Court finds such calculation to be correct, and therefore, Plaintiff is entitled to $136,855.52 in payment from Defendants.

## V. RECOMMENDATION

For the reasons stated above, the undersigned recommends default judgments against DHCCS and Mr. Alewine. Specifically, the undersigned U.S. Magistrate Judge recommends Plaintiff recover $318,325.33 in monetary damages jointly and severally from Defendants.

## VI. NOTICE

The parties are advised that objections to this Report and Recommendation, pursuant to

28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within

fourteen (14) days of its service. Failure to object to this Report and Recommendation waives

appellate review of any judgment based on it.

The Clerk is directed to send copies of this Report and Recommendation to Defendants at

the following addresses of record:

> District Heights CCS LLC
> 6840 Mink Hollow Road
> Highland, Maryland 20777
>
> Sean Alewine
> 6840 Mink Hollow Road
> Highland, Maryland 20777

                                              /s/
                                  Theresa Carroll Buchanan
                                  United States Magistrate Judge

                                  THERESA CARROLL BUCHANAN
                                  UNITED STATES MAGISTRATE JUDGE

August 29 , 2018
Alexandria, Virginia

15